**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ROBERT DAY and HELEN LOVATO,** *individually and on behalf of all others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>**CENCORA, INC., THE LASH GROUP, LLC, GLAXOSMITHKLINE LLC, and GLAXOSMITHKLINE PATIENT ACCESS PROGRAMS FOUNDATION**<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Robert Day and Helen Lovato ("Plaintiffs") bring this Class Action Complaint, individually and on behalf of all others similarly situated (the "Class Members"), against Defendants Cencora, Inc. ("Cencora"), The Lash Group, LLC ("Lash Group"), GlaxoSmithKline LLC, and GlaxoSmithKline Patient Access Programs Foundation (together, "GSK" and collectively with "Cencora" and "Lash Group," "Defendants"), and allege as follows, based upon information and belief, investigation of counsel, and the personal knowledge of Plaintiffs.

## NATURE OF CASE

1. This class action arises out of the recent targeted cyberattack and data breach where unauthorized third-party criminals retrieved and exfiltrated the highly sensitive data of Plaintiffs and hundreds of millions of Class Members, as a result of Defendants' failure to reasonably and adequately secure this highly sensitive consumer data (the "Data Breach"). The Data Breach was the result of a "smash-and-grab" attack, not ransomware.

2. During the regular course of conducting their daily business, Defendants acquire, collect, store, and transfer patients' sensitive personal data, including personally identifying

information ("PII") and protected health information ("PHI") (collectively, "Private Information"). More specifically, Defendants Cencora and Lash Group acquired Plaintiffs' and other Class Members' Private Information through the patient support and access programs they manage on behalf of GSK and other pharmacy or pharmaceutical partners. Plaintiffs and Class Members are patients who have no choice other than to provide their sensitive Private Information to Defendants directly or indirectly if they wish to receive medications or to access a pharmacy benefit program.

3.      Defendants Cencora and Lash Group partner with pharmaceutical companies, pharmacies, and healthcare providers to facilitate access to therapies through drug distribution, patient support services, business analytics and technology, and other services.[1]

4.      On February 21, 2024, Cencora learned that "data from its systems had been exfiltrated, some of which could contain personal information."[2] At that time, Cencora filed a brief Form 8-K with the SEC disclosing the attack but did not indicate the attack would compromise the Private Information of patients and consumers entrusted to Cencora by its pharmaceutical partners. Nor did Cencora begin sending notices out to affected individuals until late May.

5.      In addition to GSK, at least eleven pharmaceutical firms, each entrusted with the sensitive Private Information of millions of Americans, were impacted by the Data Breach. These firms include Novartis Pharmaceuticals Corporation, Bayer Corporation, AbbVie Inc., Regeneron Pharmaceuticals, Inc., Genentech, Inc., Incyte Corporation, Sumitomo Pharma America, Inc., Acadia Pharmaceuticals Inc., Bristol-Myer Squibb, Endo Pharmaceuticals Inc., and Dendreon Pharmaceuticals LLC.[3]

---

[1] Plaintiff Day's Data Breach Notice, attached as Exhibit A; Plaintiff Lovato's Data Breach Notice, attached as Exhibit B.
[2] *Id.*
[3] Bill Toulas, *Cencora data breach exposes US patient info from 11 drug companies*, BleepingComputer (May 24,

6.      The Private Information compromised in the Data Breach included at least Plaintiffs' and Class Members' first name, last name, address, date of birth, health diagnosis, and/or medications and prescriptions.

7.      As of May 28, 2024 at least 500,000 affected individuals had been notified, but the actual number of victims could be much higher considering that Cencora and Lash Group have serviced over 18 million customers to date.[4]

8.      Defendants are subject to HIPAA's privacy rules as healthcare business associates because they knowingly obtain, collect, and store patient Private Information. Defendants, therefore, have a duty to secure, maintain, protect, and safeguard the Private Information in their possession against unauthorized access and disclosure through reasonable and adequate data security measures.   In light of dozens of recent cyberattacks targeting the healthcare industry and exfiltrating highly sensitive healthcare information and resulting ransoms, at the time of the Data Breach, Defendants were well aware that Private Information is extremely valuable to cybercriminals. This made it highly foreseeable that Defendants would be the target of a cyberattack.

9.      Despite their duties under the law to Plaintiffs and Class Members to protect and safeguard their Private Information, and the foreseeability of a data breach, Defendants failed to implement reasonable and adequate data security measures, which directly resulted in a Data Breach.

---

2024) https://www.bleepingcomputer.com/news/security/cencora-data-breach-exposes-us-patient-info-from-11-drug-companies/.
[4] Krishi Chowdhary, Major Pharmaceutical Companies Hit by Data Breach Linked to Cencora Cyberattack, TechReport (May 28, 2024), https://techreport.com/news/major-pharmaceutical-companies-data-breach-cencora-cyberattack/

10. Defendants owed a non-delegable duty to Plaintiffs and Class Members to implement reasonable and adequate security measures to protect their Private Information. Yet, Defendants maintained and shared the Private Information in a negligent and/or reckless manner. In particular, Private Information was maintained on computer systems in a condition vulnerable to cyberattacks that lacked, for example, multi-factor authentication to access.

11. Plaintiffs' and Class Members' Private Information was compromised due to Defendants' negligent and/or reckless acts and omissions and Defendants' repeated failure to reasonably and adequately protect Plaintiffs' and Class Members' Private Information.

12. Now armed with the Private Information accessed in the Data Breach, cybercriminals can use or sell the Private Information to further harm Plaintiffs and Class Members in a variety of ways including: destroying their credit by opening new financial accounts and taking out loans in Class Members' names; using Class Members' names to improperly obtain medical services; using Class Members' Private Information to target other phishing and hacking intrusions; using Class Members' Private Information to obtain government benefits; and otherwise assuming Class Members' identities.

13. As a result of the Data Breach, Plaintiffs and Class Members face a substantial risk of imminent harm relating to the exposure and misuse of their Private Information. Plaintiffs and Class Members have and will continue to suffer injuries associated with this risk, including but not limited to a loss of time, mitigation expenses, and anxiety over the misuse of their Private Information.

14. Plaintiffs and Class Members have incurred, and will continue to incur, damages in the form of, among other things, identity theft, attempted identity theft, lost time and expenses mitigating harms, increased risk of harm, damaged credit, diminished value of Private

Information, loss of privacy, and/or additional damages as described below.

15.     Accordingly, Plaintiffs bring this action against Defendants, seeking redress for Defendants' unlawful conduct and asserting claims for: (i) negligence; (ii) negligence *per se*; (iii) breach of implied contract; (iv) breach of contractual duties owed to third-party beneficiaries; (v) unjust enrichment; (vi) bailment; and (vii) breach of fiduciary duty.

16.     Through these claims, Plaintiffs seek damages in an amount to be proven at trial, as well as injunctive and other equitable relief, including reasonable and adequate improvements to Defendants' data security systems, policies, and practices, the implementation of annual audits reviewing the same, adequate credit monitoring services funded by Defendants, and payment for the costs of repairing damaged credit as a result of the Data Breach.

## THE PARTIES

17.     Plaintiff Robert Day is a natural person, resident, and citizen of the State of Alabama.

18.     Plaintiff Helen Lovato is a natural person, resident, and citizen of the State of Utah.

19.     Defendant Cencora is a Delaware corporation with its principal place of business at 1 West First Avenue, Conshohocken, Pennsylvania.

20.     Defendant Lash Group is a part of Defendant Cencora and has its principal place of business at 1 West First Avenue, Conshohocken, Pennsylvania.

21.     Defendant GlaxoSmithKline LLC is a Delaware corporation with headquarters located at 2929 Walnut Street Suite 1700, Philadelphia, Pennsylvania 19104.

22.     Defendant GlaxoSmithKline Patient Access Programs Foundation is foundation with its principal place of business at 2929 Walnut Street Suite 1700, Philadelphia, Pennsylvania 19104.

## JURISDICTION AND VENUE

23.    This Court has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because Plaintiff, and at least one member of the putative Class, as defined below, are citizens of a different state than Defendants, there are more than 100 putative class members, and the amount in controversy exceeds $5 million exclusive of interest and costs.

24.    This Court has general personal jurisdiction over Defendants because all Defendants have their principal places of business in this district, and all Defendants operate in and direct commerce at this District.

25.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all Defendants' principal places of business are located in this District, a substantial part of the events giving rise to this action occurred in this District, and Defendants have harmed Class Members residing in this District.

## DEFENDANTS' BUSINESSES

26.    Defendant Cencora is a leading pharmaceutical solutions organization which provides "end-to-end pharmaceutical commercialization solutions" and claims to "empower[] patient-centered care all over the world."[5]

27.    Defendant Lash Group is a part of Cencora (formerly AmerisourceBergen) with expertise in over 20 therapeutic areas, and which operates over 100 patient support programs.[6]

28.    Defendant GlaxoSmithKline Group of Companies is a "global biopharma company with ambition and purpose to unite science, technology and talent to get ahead of disease."[7]

---

[5] Cencora, Who We Are, https://www.cencora.com/who-we-are (last visited May 29, 2024).
[6] AmerisourceBergen: Lash Group, Who We Are, https://www.lashgroup.com/who-we-are (last visited May 29, 2024).
[7] Contact Us, GSK, https://us.gsk.com/en-us/contact-us/ (last visited June 10, 2024).

29.     Defendant GlaxoSmithKline Patient Access Programs Foundation is "a program committed to assisting eligible patients access our medications. We offer programs for patients who meet income and other eligibility requirements."[8]

30.     Plaintiffs and Class Members are former or current patients and consumers who used Defendants' services, either directly or indirectly. Plaintiffs and Class Members indirectly used Defendant Cencora's or Defendant Lash Group's services when Plaintiffs' and Class Members' pharmacies, pharmaceutical companies, healthcare providers, or pharmacy benefit programs (like GSK) contracted with Defendants Cencora and/or Lash Group for their services.

31.     In the course of facilitating support to pharmacies, pharmaceutical companies, and healthcare providers related to Plaintiffs' and Class Members' healthcare, Defendants receive, create, handle, and transfer patients' Private Information. Indeed, to receive services from Defendants, either directly or indirectly, Plaintiffs and Class Members were required to provide highly sensitive Private Information, including some or all of the following:

- Full names and addresses;

- Personal email addresses and phone numbers;

- Dates of birth;

- Social Security numbers;

- Driver's licenses (or other similar state identifications);

- Health insurance information;

- Health information including but not limited to information about diagnosis and treatment, personal medical history, family medical history, mental health information, information related to STDs and treatment, information related to

---

[8] Welcome to GSK for You, GSKforyou, https://www.gskforyou.com/ (last visited June 10, 2024).

abortions, medication information, and medical record numbers;

- Information about physicians and related medical professionals who had been involved in previous or ongoing treatment of the patient;

- Billing and claims information, including but not limited to information related to credit and debit card numbers, bank account statements and account numbers, and insurance payment details;

- Medicare/Medicaid information;

- Medication information; and

- Diagnostic results and treatment information.

32.     This sort of Private Information is extremely sensitive and is extremely valuable to criminals because it can be used to commit serious identity and medical identity theft crimes.

33.     Upon information and belief, Defendants promise to, among other things: keep Private Information private; comply with healthcare industry standards related to data security and Private Information, including FTC guidelines; inform consumers of their legal duties and comply with all federal and state laws protecting consumer Private Information; only use and release Private Information for reasons that relate to the products and services Plaintiffs and Class Members obtain from Defendants and provide adequate notice to individuals if their Private Information is disclosed without authorization.

34.     As HIPAA covered business entities, as discussed *infra*, Defendants are required to implement adequate safeguards to prevent unauthorized use or disclosure of Private Information, including by implementing the requirements of the HIPAA Security Rule and to report any unauthorized use or disclosure of Private Information, including incidents that constitute breaches of unsecured PHI, as in the case of the Data Breach complained of herein.

35.    However, despite the existence of these duties, Defendants did not maintain adequate security to protect their systems from infiltration by cybercriminals.

36.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties owed to Plaintiffs and Class Members and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

37.    Yet, contrary to Defendants' representations, Defendants failed to implement adequate data security measures, as evidenced by Defendants' admission of the Data Breach, which affected, by some estimates, one-third of all Americans.[9]

**Defendants are Covered Entities Subject to HIPAA**

38.    Defendants are "business associates" of healthcare providers and covered entities under HIPAA, each of whom provide healthcare, medication, pharmacy, and pharmaceutical related services to hundreds of millions of patients annually either directly or via their healthcare clients. As a regular and necessary part of their businesses, Defendants collect, store, and transfer the highly sensitive Private Information of patients.

39.    As covered entities, Defendants are required under federal and state law to maintain the strictest confidentiality of the Private Information they acquire, receive, collect, transfer, and store. Defendants are further required to maintain sufficient safeguards to protect that Private Information from being accessed by unauthorized third parties.

40.    Due to the nature of Defendants' businesses, which includes providing a range of drug distribution, patient support services, business analytics and technology, and other services to healthcare clients, including obtaining, storing, and maintaining electronic health and medical

---

[9] Testimony of Andrew Witty Chief during the U.S. Senate Committee on Finance, Hacking America's Health Care: Assessing the Change Healthcare Cyber Attack and What's Next (May 1, 2024).

records, Defendants would be unable to engage in their regular business activities without collecting and aggregating Private Information they know and understand to be sensitive and confidential.

41.     In fact, whenever Defendants contract with covered entities (healthcare providers) to provide various business and medical services, HIPAA requires that these contracts mandate that Defendants will use adequate safeguards to prevent unauthorized use or disclosure of PHI, including by implementing the HIPAA Security Rule[10] and immediately reporting any unauthorized use or disclosure of PHI (such as the Data Breach) to affected covered entities.

42.     For their part, Defendants Cencora and Lash Group explicitly tout their commitment to protecting the privacy of Private information, claiming that:

> Cencora, Inc. and its affiliate companies ("Cencora") *value and protect the personal information* entrusted to the company by its suppliers, customers, and visitors. As a United States company doing business around the world, Cencora *maintains a comprehensive privacy program* designed to comply with its legal obligations under applicable law.[11]

43.     GSK likewise claims that "[w]e take our responsibility for data privacy seriously," stating: "GSK will take appropriate legal, organizational, and technical measures to protect your personal information consistent with applicable privacy and data security laws."[12]

44.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

---

[10] The HIPAA Security Rule establishes national standards to protect individuals' electronic personal health information that is created, received, used, or maintained by a covered entity. The Security Rule requires appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information. See 45 C.F.R. Part 160 and Part 164, Subparts A and C

[11] Privacy Statement Overview, Cencora, https://www.cencora.com/global-privacy-statement-overview (last accessed May 29, 2024) (emphasis added).

[12] GSK Privacy Center, GSK, https://privacy.gsk.com/en-us/privacy-notice/ (last visited June 10, 2024).

45.     Plaintiffs and Class Members are or were patients, or executors or surviving spouses of patients, whose Private Information was maintained by Defendants and directly or indirectly entrusted Defendants with their Private Information.

46.     Plaintiffs and Class Members relied on Defendants to implement and follow adequate data security policies and protocols, to keep their Private Information confidential and securely maintained, to use such Private Information solely for business and healthcare purposes, and to prevent unauthorized disclosures of Private Information. Plaintiffs and Class Members reasonably expected that Defendants would safeguard and keep their Private Information confidential.

47.     As described throughout this Complaint, Defendants failed to reasonably and adequately protect, secure, and/or store Plaintiffs' and Class Members' Private Information prior to, during, or after the Data Breach, but rather, enacted unreasonable data security measures they knew or should have known were insufficient to reasonably protect the highly sensitive Private Information that they maintained. Consequently, cybercriminals circumvented Defendants' security measures, resulting in a significant Data Breach.

**The Data Breach of Defendants' Systems**

48.     Beginning on or around February 21, 2024, Defendant Cencora was subjected to a "smash-and-grab" cyberattack which compromised the sensitive Private Information of Plaintiffs and Class Members. Unlike ransomware attacks, smash-and-grab attacks are characterized by their rapid execution, which make them difficult to detect and halt in real time.[13]

---

[13] Sreenu Pasunuri, Digital Heists: The Rising Threat of Smash & Grab Cyber Attacks, LinkedIn (May 20, 2024)https://www.linkedin.com/pulse/digital-heists-rising-threat-smash-grab-cyber-attacks-sreenu-pasunuri-fhz0c/.

49.    In a Form 8-K filed with the SEC, Cencora noted that it learned "that data from its information systems had been exfiltrated, some of which may contain personal information."[14] Cencora's SEC notice also stated that Cencora was investigating the Data Breach:

> Upon initial detection of the unauthorized activity, the Company immediately took containment steps and commenced an investigation with the assistance of law enforcement, cybersecurity experts and external counsel.[15]

50.    Cencora's investigation concluded April 10, 2024, and determined that Plaintiffs' and Class Members' Private Information was compromised in the Data Breach. Specifically, Cencora's investigation discovered that personal information including Plaintiffs' and Class Members' full names, addresses, dates of birth, health diagnoses, and/or medications and prescriptions were exfiltrated in the Data Breach.

51.    Yet, Cencora waited over *one month* after determining that Plaintiffs' and Class Member's Private Information was compromised, and over *three months* after it initially discovered the Data Breach to begin notifying affected individuals. Plaintiffs Day and Lovato still have yet to receive any notice or acknowledgement of the Data Breach from the GSK Defendants to which they entrusted their Private Information in the first instance.

52.    In late May, Cencora sent Plaintiffs and other Class Members a Data Breach Notice which said the following:

**What Happened?**

On February 21, 2024 Cencora learned that data from its information systems had been exfiltrated, some of which could contain personal information. Upon initial detection of the unauthorized activity, Cencora immediately took containment steps and commenced an investigation with the assistance of law enforcement, cybersecurity experts, and outside lawyers. On April 10, 2024, we confirmed that some of your personal information was affected by the incident.

---

[14] Cencora, Inc. Form 8-K, U.S. Securities and Exchange Commission (Feb. 21, 2024), https://www.sec.gov/Archives/edgar/data/1140859/000110465924028288/tm247267d1_8k.htm.
[15] *Id.*

53.     Omitted from the Data Breach Notice is information explaining the root cause of the Data Breach, the vulnerabilities exploited by the cybercriminals, any Defendants' prior data breach histories, and any new remedial measures undertaken to ensure similar breaches do not continue to occur exposing customers' Private Information. To date, these omitted details have not been explained or revealed to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information is not repeatedly exposed to cybercriminals by Defendants.

54.     Upon information and belief, the cybercriminals responsible for the Data Breach specifically targeted Defendants based on their status as healthcare entities with enormous amounts of valuable Private Information—including the Private Information of Plaintiffs and Class Members.

55.     Plaintiffs further believe that their and Class Members' Private Information has been or soon will be disseminated on the dark web, to be available for purchase, because that is the *modus operandi* of cybercriminals.

56.     As HIPAA covered business entities that collect, create, transfer, and maintain significant volumes of Private Information, the targeted attack was a foreseeable risk which Defendants were aware of, had previously and recently been affected by, and knew they had a duty to guard against. It is well-known that healthcare providers and their business associates, such as Defendants, which collect and store confidential and sensitive Private Information of millions of individuals, are frequently targeted by cyberattacks. Further, cyberattacks are highly preventable through the implementation of reasonable and adequate cybersecurity safeguards, including proper employee cybersecurity training.

57.     The U.S. Department of Health and Human Services ("HHS") and the Office of Consumer Rights urges HIPAA entities to encrypt data containing sensitive personal information.

To underscore the necessity of doing so to protect consumers' data, as far back as 2014, the Department fined two healthcare companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan McAndrew, formerly OCR's deputy director of health information privacy, stated that "[o]ur message to these organizations is simple: *encryption is your best defense against these incidents*." Despite these fines and warnings, Defendants failed to encrypt Plaintiffs' and Class Members' Private Information.

58.     The Data Breach was a targeted cyberattack expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the Private Information of patients, like Plaintiffs and Class Members.

59.     Defendants had obligations created by HIPAA, contract, industry standards, and common law to keep their Private Information confidential and protected from unauthorized access and disclosure.

60.     Plaintiffs and Class Members (or their healthcare providers, pharmacies, or patient support programs) entrusted Defendants with their Private Information with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

61.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties and knew, or should have known, they were responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

62.     Due to Defendants' inadequate security measures and their delayed notice to victims, Plaintiffs and Class Members were unable to obtain necessary health services and

prescriptions affecting their health and wellbeing and now also face a present, immediate, and ongoing risk of fraud and identity theft that they will have to deal with for the rest of their lives.

**The Data Breach was a Foreseeable Risk of which Defendants Were on Notice**

63.     As HIPAA-covered entities handling Private Information, Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and data breaches in the healthcare industry and other industries holding significant amounts of PII and PHI preceding the Data Breach.

64.     At all relevant times, Defendants knew, or should have known that Plaintiffs' and Class Members' Private Information was a target for malicious actors. Yet, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class Members' Private Information from cyberattacks that Defendants knew directly about and should have guarded against.

65.     The healthcare sector suffered at least 337 data breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July 2022. The percentage of healthcare data breaches attributed to malicious activity rose more than five percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[16]

66.     In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies—including HCA Healthcare (11 million patients, July 2023), Managed Care of North America (8.8 patients, March 2023), Shields Health Care Group (2 million patients, March 2022), Broward Health (1.3 million patients, January 2022), OneTouchPoint (2.6 million

---

[16] *See* Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, HEALTH IT SECURITY: CYBERSECURITY NEWS (July 19, 2022),
https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year.

patients, July 2022), Trinity Health (3.3 million patients, May 2020), and American Medical Collection Agency (25 million patients, March 2019)—Defendants knew or should have known their electronic records would be targeted by cybercriminals.

67.     PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[17] A cybercriminal who steals a person's PHI can end up with as many as "seven to 10 personal identifying characteristics of an individual."[18] A study by Experian found that the "average total cost" of medical identity theft to the victims of such theft was "about $20,000" per victim, per incident in 2010, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[19]

68.     In fact, according to the cybersecurity firm Mimecast, 90 percent of healthcare organizations experienced cyberattacks in 2020.[20]

69.     Cyberattacks on medical systems have become so common that in 2019 the FBI and U.S. Secret Service issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[21]

70.     This was not the FBI's first warning to the healthcare industry about the threat of cyberattacks.  Indeed, cyberattacks against the healthcare industry have been common for over a

---

[17] *See* Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH MAGAZINE (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").
[18] *Id.*
[19]  Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/.
[20] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, SECURITY MAGAZINE (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.
[21] *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

decade, with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII[.]" The FBI further warned that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[22]  Later, in August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."

71.    According to an article in the HIPAA Journal posted on November 2, 2023, cybercriminals hack into medical practices for their highly prized medical records. "[T]he number of data breaches reported by HIPAA-regulated entities continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights (OCR)] – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[23]

72.    According to the HIPAA Journal's 2023 Healthcare Data Breach Report, "[a]n unwanted record was set in 2023 with 725 large security breaches in healthcare reported to the Department of Health and Human Services Office for Civil Rights, beating the record of 720 healthcare security breaches set the previous year."[24]

---

[22] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.

[23] Steve Alder, *Editorial: Why Do Criminals Target Medical Records*, THE HIPAA JOURNAL (Nov. 2, 2023), https://www.hipaajournal.com/why-do-criminals-target-medical-records.

[24] Steve Adler, *Security Breaches in Healthcare in 2023*, The HIPAA Journal (January 31, 2024), https://www.hipaajournal.com/wp-content/uploads/2024/01/Security_Breaches_In_Healthcare_in_2023_by_The_HIPAA_Journal.pdf.

73.     Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[25] In this case, Defendants failed to reasonably and adequately protect the stored records of *hundreds of millions* of patients—roughly one-third of all Americans.

74.     Private Information, like that stolen from Defendants, is "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[26]

75.     The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; *it's a patient safety issue*. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that *cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.*[27]

76.     The Data Breach resulting in the theft of Plaintiffs' and Class Members' Private Information poses a known patient safety issue, including the interruption of important medical

---

[25] *See id.*

[26] *See id.*

[27] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASS'N (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.

services.

77.     Given the wealth of information from the law enforcement and healthcare industry concerning the increasing prevalence of cyberattacks, Defendants knew and should have known about its data security vulnerabilities and implemented enhanced and adequate protection to protect and secure Plaintiffs' and Class Members' Private Information.  Knowing the risk, Defendants failed to do so.

### Defendants Failure to Comply with FTC Guidelines

78.     The Federal Trade Commission ("FTC") has regularly promulgated guidelines for businesses, including HIPAA entities, which highlight the necessity of implementing reasonable data security practices. According to the FTC, the need for data security should factor into all business decision-making.

79.     For example, in 2016, the FTC updated its published guidelines, *Protecting Personal Information: A Guide for Business*, which laid out standard and accepted cyber-security measures for businesses to implement to protect consumers' private data. The guidelines advise businesses, *inter alia*, to: encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[28]

80.     The FTC's guidelines further advise businesses:  not to maintain PII longer than necessary for authorization of a transaction; to limit access to sensitive data; to require complex passwords to be used on networks; to use industry-tested methods for security; to monitor for suspicious activity on the network; and to verify that third-party service providers have implemented reasonable security measures.[29]

---

[28] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.
[29] *Id.*

81.    To underscore the binding significance of the promulgated guidance, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, pursuant to Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further identify the measures businesses *must* take to meet their data security obligations consistent with federal law.

82.    These FTC enforcement actions include actions against healthcare providers and partners like Defendants. *See, e.g.*, *In the Matter of LabMD, Inc., A Corp*, No. 9357, 2016 WL 4128215, at *32 (F.T.C. July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act."), *vacated on other grounds, LabMD, Inc. v. Fed. Trade Comm'n*, 894 F.3d 1221 (11th Cir. 2018).

83.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

84.    Defendants were at all times fully aware of their obligations to protect the Private Information of customers and patients. Defendants were also aware of the significant repercussions that would result from their failure to do so.

**<u>Defendants' Failure to Comply with Accepted Industry Standards for Data Security</u>**

85.    In light of the evident threat of cyberattacks seeking consumers' Private Information, several best practices have been identified by regulatory agencies and experts that, at a minimum, should be implemented by healthcare service providers like Defendants to secure Plaintiffs' and Class Members' Private Information, including but not limited to: educating and training all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and

anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; monitoring and limiting the network ports; protecting web browsers and email management systems; and limiting which employees can access sensitive data.

86.     On information and belief, Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

87.     These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendants failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

### Defendants' Failure to Comply with Their HIPAA Obligations to Safeguard Private Information

88.     As healthcare service providers handling medical patient data and providing services to healthcare providers, pharmacies, and pharmaceutical companies, Defendants are covered entities under HIPAA (45 C.F.R. § 160.103) and are required to comply with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C ("Security Standards for the Protection of Electronic Protected Health Information").

89.     HIPAA requires covered entities to protect against reasonably anticipated threats to the security of sensitive patient health information.

90.     Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

91.     HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information that is kept or transferred in electronic form.

92.     HIPAA covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. These safeguards include physical, technical, and administrative components.

93.     The Data Breach is considered a breach under the HIPAA Rules because it involved an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as "the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." *See* 45 C.F.R. 164.40

94.     The Data Breach resulted from a combination of multiple failures by the Defendants to adequately and reasonably secure the Plaintiffs' and Class Members' Private Information in violation of the mandates set forth in HIPAA's regulations.

**<u>Defendants' Failure to Adequately and Reasonably Secure Plaintiffs' and Class Members'
Private Information has Increased Their Risk of Fraud and Identity Theft</u>**

95.     Cyberattacks and data breaches at healthcare service providers like Defendants are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

96.     Researchers have found that, among medical service providers that experience a data security incident, the death rate among patients increased in the months and years after the

attack.[30]

97.     Researchers have further found that for medical service providers that experienced a data security incident, the incident was associated with deterioration in timeliness of care and patient outcomes.[31]

98.     The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft face "substantial costs and time to repair the damage to their good name and credit record."[32]

99.     That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal PII is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, and take over victims' identities to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique known as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing

---

[30] *See* Nsikan Akpan, *Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks*, PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomware-and-other-data-breaches-linked-to-uptick-in-fatal-heart-attacks.
[31] *See* Sung J. Choi, et al., *Data Breach Remediation Efforts and Their Implications for Hospital Quality*, 54 Health Services Research 971, 971-980 (2019), *available at*
https://onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203.
[32] *See* U.S. Gov. Accounting Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), *available at* https://www.gao.gov/new.items/d07737.pdf.

emails.

100.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[33]

101.    Moreover, theft of Private Information is also gravely serious because Private Information is an extremely valuable property right.[34]

102.    Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

103.    It must also be noted there may be a substantial time lag – measured in years – between when harm occurs and when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used.

104.    According to the GAO, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

---

[33] *See IdentityTheft.gov*, FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Steps (last visited Dec. 11, 2023).
[34] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

GAO Report at 29.

105.    Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

106.    Thus, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts, or the accounts of deceased individuals for whom Class Members are the executors or surviving spouses, for many years to come.

107.    Private Information can sell for as much as $363 per record according to the Infosec Institute.[35] Private Information is particularly valuable because criminals can use it to target victims with frauds and scams. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

108.    Medical information is especially valuable to identity thieves.

109.    Theft of PHI, in particular, is gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[36]

110.    Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their

---

[35] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.
[36] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited Dec. 11, 2023).

insureds' medical insurance premiums.

111.    Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries.

112.    For this reason, Defendants knew or should have known about these dangers and strengthened their data and email handling systems accordingly. Defendants were on notice of the substantial and foreseeable risk of harm from a data breach, yet Defendants failed to properly prepare for that risk.

## Defendants' Failure to Adequately and Reasonably Protect Against The Data Breach was Reckless and Negligent

113.    Defendants breached their obligations to Plaintiffs and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data to protect and/or to implement adequate data security oversight and practices necessary to safeguard stored Private Information. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.    Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

    b.    Failing to adequately protect patients' and customers' Private Information;

    c.    Failing to properly monitor their own data security systems for existing intrusions;

    d.    Failing to ensure that their vendors with access to their computer systems and/or data employed reasonable security procedures;

    e.    Failing to train their employees in the proper handling of emails containing Private Information and maintain adequate email security practices;

f.   Failing to ensure the confidentiality and integrity of electronic PHI they created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

g.   Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

h.   Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

i.   Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

j.   Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

k.   Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

l.   Failing to ensure compliance with HIPAA security standard rules by their workforces in violation of 45 C.F.R. § 164.306(a)(4);

m.   Failing to train all members of their workforces effectively on the policies and procedures regarding PHI as necessary and appropriate for the members

27

of their workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b);

n.     Failing to render the electronic Private Information they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as they had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR § 164.304's definition of "encryption");

o.     Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

p.     Failing to adhere to industry standards for cybersecurity as discussed above; and

q.     Otherwise breaching their duties and obligations to protect Plaintiffs' and Class Members' Private Information.

114.    Defendants negligently, recklessly, and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access Defendants' computer network and systems which contained unsecured and unencrypted Private Information for multiple days.

115.    Accordingly, as outlined below, Plaintiffs and Class Members now face an increased risk of fraud and identity theft. In addition, Plaintiffs and Class Members also lost the benefit of the bargain they made with Defendants.

## **Plaintiffs' and Class Members' Damages**

116.    Given the sensitivity of the Private Information involved in this Data Breach, Plaintiffs and Class Members have all suffered damages and will face a substantial risk of additional injuries for years to come, if not the rest of their lives. Defendants have done nothing to compensate Plaintiffs or Class Members for many of the injuries they have already suffered. Defendants have not demonstrated any efforts to prevent additional harm from befalling Plaintiffs and Class Members as a result of the Data Breach.

117.    Plaintiffs and Class Members have been damaged by the compromise of their Private Information in the Data Breach, which is now in the hands of cybercriminals.

118.    Since being notified of the Data Breach, Plaintiffs have spent time dealing with the impact of the Data Breach, valuable time Plaintiffs otherwise would have spent on other activities, including but not limited to time with their families, work and/or recreation.

119.    Due to the Data Breach, Plaintiffs anticipate spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. This includes changing passwords, cancelling credit and debit cards, and monitoring her accounts for fraudulent activity.

120.    Plaintiffs' and Class Members' Private Information was compromised as a direct and proximate result of the Data Breach.

121.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have been placed at a present, imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

122.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have been forced to spend time dealing with the effects of the Data Breach.

123.    Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

124.    Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on Plaintiffs' and Class Members' Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class Members.

125.    Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

126.    Plaintiffs and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in similar cases.

127.    Plaintiffs and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiffs and Class Members overpaid for a service that was intended to be accompanied by adequate data security that complied with industry standards but was not. Part of the price Plaintiffs and Class Members paid to Defendants and/or Defendants' healthcare partners was intended to be used by Defendants to fund adequate security of their computer system(s) and Plaintiffs' and Class Members' Private Information. Thus, Plaintiffs and Class Members did not get what they paid for and agreed to.

128.    Plaintiffs and Class Members have spent and will continue to spend significant amounts of time monitoring their accounts and sensitive information for misuse.

129.    Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

      a.  Reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

      b.  Purchasing credit monitoring and identity theft prevention;

      c.  Placing "freezes" and "alerts" with reporting agencies;

      d.  Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

      e.  Contacting financial institutions and closing or modifying financial accounts; and

      f.  Closely reviewing and monitoring Social Security number, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

130.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

131.    Further, as a result of Defendants' conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Private Information—which contains the most intimate

details about a person's life, including what ailments they suffer from, whether physical or mental—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

132.    Moreover, the magnitude of harm arising from this Data Breach is greater in kind and extent than harm resulting from other Data Breaches in the healthcare sector, owing to the fact that Plaintiffs and Class Members suffered injuries beyond those arising from the theft of their Private Information. Specifically, Plaintiffs and Class Members suffered harm from increased out-of-pocket expenses to obtain medical services and prescriptions, being unable to fill their prescriptions entirely, and/or not being able to apply discount coupons to afford their medications or healthcare services.

133.    As a direct and proximate result of Defendants' actions and inactions, Plaintiffs and Class Members have suffered anxiety, emotional distress, loss of time, loss of privacy, and are at an increased risk of future harm.

## Plaintiffs' Experiences

### Plaintiff Day's Experience

134.    To use Defendants' services, Plaintiff Day—like other Class Members—provided sensitive Private Information including his full name, address, date of birth, Social Security number, medical records, insurance information, billing, banking, and credit card information, family medical history, and more either to Defendants directly or to his healthcare providers or pharmacies to provide to Defendants.

135.    Defendants obtained and continue to store and maintain Plaintiffs' and Class Members' Private Information. Defendants owe Plaintiff Day a legal duty and obligation to protect his Private Information from unauthorized access and disclosure. Plaintiff Day's Private

Information was compromised and disclosed as a result of Defendants' inadequate data security practices, which resulted in the Data Breach.

136.    Over three months after the Data Breach, Defendants have yet to confirm the exact information that was compromised in the Data Breach. However, on information and belief, Class Members' compromised data includes, but is not limited to: patient name, address, date of birth, health diagnosis, and medications and prescriptions information.

137.    Plaintiff Day is very careful with his Private Information. He stores any documents containing his Private Information in a safe and secure location or destroys the documents. Plaintiff Day has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Moreover, Plaintiff Day diligently chooses unique usernames and passwords for his various online accounts.

138.    As a result of the Data Breach, Plaintiff Day made reasonable efforts to mitigate the impact of the Data Breach after receiving the Data Breach notification letter, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, and monitoring his credit.

139.    Plaintiff Day was forced to spend multiple hours attempting to mitigate the effects of the Data Breach. He will continue to spend valuable time she otherwise would have spent on other activities, including but not limited to time with his family, work and/or recreation. This is time that is lost forever and cannot be recaptured.

140.    Plaintiff Day suffered actual injury and damages as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of his Private Information, a form of intangible property that Defendants obtained from Plaintiff Day and/or Plaintiff Day's doctors and medical professionals; (b) violation of his privacy rights; (c) the theft of his Private

Information; (d) loss of time; (e) imminent and impending injury arising from the increased risk of identity theft and fraud; (f) increased out-of-pocket medical expenses; (g) failure to receive the benefit of his bargain; and (h) nominal and statutory damages.

141.    Plaintiff Day has also suffered emotional distress that is proportional to the risk of harm and loss of privacy caused by the theft of his Private Information which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his Private Information for purposes of identity theft and fraud. Plaintiff Day has also suffered anxiety about unauthorized parties viewing, using, and/or publishing information related to his health history and prescriptions. This is particularly significant given that Plaintiff Day provided his Private Information to Defendants, to receive services for a condition that measurably worsens with stress.

142.    As a result of the Data Breach, Plaintiff Day anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Day will continue to be at a present, imminent, and continued increased risk of identity theft and fraud in perpetuity.

143.    Plaintiff Day has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

### *Plaintiff Lovato's Experience*

144.    To use Defendants' services, Plaintiff Lovato—like other Class Members—provided sensitive Private Information including her full name, address, date of birth, Social Security number, medical records, insurance information, billing, banking, and credit card information, family medical history, and more either to Defendants directly or to her healthcare

providers or pharmacies to provide to Defendants.

145.    Defendants obtained and continue to store and maintain Plaintiff Lovato's and Class Members' Private Information. Defendants owe Plaintiff Lovato a legal duty and obligation to protect her Private Information from unauthorized access and disclosure. Plaintiff Lovato's Private Information was compromised and disclosed as a result of Defendants' inadequate data security practices, which resulted in the Data Breach.

146.    Over three months after the Data Breach, Defendants have yet to confirm the exact information that was compromised in the Data Breach. However, on information and belief, Class Members' compromised data includes, but is not limited to: patient name, address, date of birth, health diagnosis, and medications and prescriptions information.

147.    Plaintiff Lovato is very careful with her Private Information. She stores any documents containing her Private Information in a safe and secure location or destroys the documents. Plaintiff Lovato has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Moreover, Plaintiff Lovato diligently chooses unique usernames and passwords for her various online accounts.

148.    As a result of the Data Breach, Plaintiff Lovato made reasonable efforts to mitigate the impact of the Data Breach after receiving the Data Breach notification letter, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, and monitoring her credit.

149.    Despite these efforts Plaintiff Lovato has noticed a significant uptick in spam and phishing messages since late February 2024, after the Data Breach occurred. Plaintiff Lovato was forced to spend multiple hours attempting to mitigate the effects of the Data Breach. She will continue to spend valuable time she otherwise would have spent on other activities, including but

not limited to time with her family, work and/or recreation. This is time that is lost forever and cannot be recaptured.

150.    Plaintiff Lovato suffered actual injury and damages as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of her Private Information, a form of intangible property that Defendants obtained from Plaintiff Lovato and/or Plaintiff Lovato's doctors and medical professionals; (b) violation of her privacy rights; (c) the theft of her Private Information; (d) loss of time; (e) imminent and impending injury arising from the increased risk of identity theft and fraud; (f) increased out-of-pocket medical expenses; (g) failure to receive the benefit of her bargain; and (h) nominal and statutory damages.

151.    Plaintiff Lovato has also suffered emotional distress that is proportional to the risk of harm and loss of privacy caused by the theft of her Private Information which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of identity theft and fraud. Plaintiff Lovato has also suffered anxiety about unauthorized parties viewing, using, and/or publishing information related to her health history and prescriptions. This is particularly significant given that Plaintiff Lovato provided her Private Information to Defendants, to receive services for a condition that measurably worsens with stress.

152.    As a result of the Data Breach, Plaintiff Lovato anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Lovato will continue to be at a present, imminent, and continued increased risk of identity theft and fraud in perpetuity.

153.    Plaintiff Lovato has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected

and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

154.    Plaintiffs bring this action against Defendants individually and on behalf of all other persons similarly situated.

155.    Plaintiffs propose the following Class and Subclass definitions, subject to amendment as appropriate:

> **National Class: All persons or, if minors, their parents or guardians, or, if deceased, their executors or surviving spouses, who Defendants identified as being among those individuals whose Private Information was compromised in the Data Breach (the "Class").**
>
> **Alabama Subclass: All persons or, if minors, their parents or guardians, or, if deceased, their executors or surviving spouses, residing in Alabama who Defendants identified as being among those individuals whose Private Information was compromised in the Data Breach (the "Alabama Subclass").**
>
> **Utah Subclass: All persons or, if minors, their parents or guardians, or, if deceased, their executors or surviving spouses, residing in Utah who Defendants identified as being among those individuals whose Private Information was compromised in the Data Breach (the "Utah Subclass").**

156.    Excluded from the Class (and Subclass) are Defendants' officers, directors, and employees; any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

157.    Plaintiffs reserve the right to amend or modify the Class or Subclass definition or create additional subclasses as this case progresses.

158. <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. As of May 28, 2024, over 500,000 individuals were sent.

159. <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendants unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

b. Whether Defendants failed to implement and maintain reasonable and adequate security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, *e.g.*, HIPAA;

d. Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendants owed a duty to Plaintiffs and Class Members to safeguard their Private Information;

f. Whether Defendants breached their duty to Plaintiffs and Class Members to safeguard their Private Information;

g. Whether Defendants knew or should have known that their data security systems and monitoring processes were deficient;

h. Whether Defendants should have discovered the Data Breach sooner;

i. Whether Plaintiffs and Class Members suffered legally cognizable damages

as a result of Defendants' misconduct;

j.    Whether Defendants' conduct was negligent;

k.    Whether Defendants breached implied contracts with Plaintiffs and Class Members;

l.    Whether Defendants were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiffs and Class Members;

m.    Whether Defendants failed to provide notice of the Data Breach in a timely manner, and;

n.    Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

160.    Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' information, like that of every other Class Member, was compromised in the Data Breach.

161.    Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions.

162.    Predominance. Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the data of Plaintiffs and Class Members was stored on the same network and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

163.    Superiority. A class action is superior to other available methods for the fair and

efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, to conduct this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

164.    Defendants have acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a classwide basis.

165.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.  Whether Defendants failed to timely notify the public of the Data Breach;

    b.  Whether Defendants owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

    c.  Whether Defendants' security measures to protect their data systems were reasonable and adequate in light of best practices recommended by data security experts;

    d.  Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

    e.   Whether Defendants failed to take commercially reasonable steps to safeguard consumer Private Information; and

    f.   Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

166.    Finally, all members of the proposed Class are readily ascertainable. Defendants have access to names and addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

## CLAIMS FOR RELIEF

### COUNT I
### Negligence and Negligence Per Se
### (*On Behalf of Plaintiffs and the Class*)

167.    Plaintiffs re-allege and incorporate by reference factual allegations above as if fully set forth herein.

168.    By collecting and storing the Private Information of Plaintiffs and Class Members, in their computer systems and networks, and sharing it and using it for commercial gain, Defendants owed a duty of care to use reasonable means to secure and safeguard their computer systems—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendants' duty included a responsibility to implement processes by which they could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

169.    Defendants owed a duty of care to Plaintiffs and Class Members to provide data

41

security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

170.   Plaintiffs and Class Members are a well-defined, foreseeable, and probable group of patients that Defendants were aware, or should have been aware, could be injured by inadequate data security measures.

171.   Defendants' duty of care to use reasonable and adequate security measures arose as a result of the special relationship that existed between Defendants and consumers, which is recognized by laws and regulations including but not limited to HIPAA, the FTC Act, and common law. Defendants were in a superior position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a data breach.

172.   Defendants' duty to use reasonable security measures under HIPAA required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

173.   In addition, Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair... practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

174.   Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are

bound by industry standards to protect confidential Private Information.

175.    Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiffs' sand Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

     a.  Failing to adopt, implement, and maintain reasonable and adequate security measures to safeguard Plaintiffs' and Class Members' Private Information;

     b.  Failing to adequately monitor the security of their networks and systems;

     c.  Failing to ensure that their email systems had reasonable data security safeguards in place;

     d.  Failing to have in place reasonable and adequate mitigation policies and procedures;

     e.  Allowing unauthorized access to Plaintiffs' and Class Members' Private Information;

     f.  Failing to detect in a timely manner that Plaintiffs' and Class Members' Private Information had been compromised; and

     g.  Failing to timely notify Plaintiffs and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

176.    Plaintiffs and Class Members have no ability to protect their Private Information that was or remains in Defendants' possession.

177.    It was foreseeable that Defendants' failure to use reasonable measures to protect

Plaintiffs' and Class Members' Private Information would result in injury to Plaintiffs and Class Members. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

178.    It was therefore foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' Private Information would result in one or more types of injuries to Plaintiffs and Class Members.

179.    Defendants' conduct was grossly negligent and departed from reasonable standards of care, including but not limited to, failing to adequately protect the Private Information, and failing to provide Plaintiffs and Class Members with timely notice that their sensitive Private Information had been compromised.

180.    Neither Plaintiffs nor Class Members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

181.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia,* (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

182.    The injury and harm Plaintiffs' and Class Members suffered was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties, and that Defendants' breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

183.    As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory and consequential damages

in an amount to be proven at trial.

## COUNT II
### Breach of Implied Contract
### *(On behalf of Plaintiffs and the Class)*

184.    Plaintiffs re-allege and incorporate by reference factual allegations above as if fully set forth herein.

185.    Defendants acquired and maintained the Private Information of Plaintiffs and the Class that they received either directly or from their healthcare providers.

186.    When Plaintiffs and Class Members paid money and provided their Private Information to their doctors and/or healthcare providers, including their pharmacies, pharmaceutical companies, or patient support programs like GSK, either directly or indirectly, in exchange for goods or services, they entered into implied contracts with their doctors and/or healthcare professionals, their business associates, and partners, including Defendants.

187.    Plaintiffs and Class Members entered into implied contracts with Defendants under which Defendants agreed to safeguard and protect such information and to timely and accurately notify Plaintiffs and Class Members that their information had been breached and compromised.

188.    Plaintiffs and the Class were required to deliver their Private Information to Defendants as part of the process of obtaining services provided by Defendants, either directly or indirectly. Plaintiffs and Class Members paid money, or money was paid on their behalf, to Defendants in exchange for services.

189.    Defendants directly or indirectly solicited, offered, and invited Class Members to provide their Private Information as part of Defendants' regular business practices. Plaintiffs and Class Members accepted Defendants offers and provided their Private Information to Defendants or, alternatively, provided their information to doctors or other healthcare professionals, who then

provided it to Defendants.

190.    Defendants accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services to Plaintiffs and Class Members and/or their doctors and other healthcare professionals.

191.    In accepting such information and payment for services, Defendants entered into implied contracts with Plaintiffs and Class Members whereby Defendants became obligated to reasonably safeguard Plaintiffs' and Class Members' Private Information.

192.    Alternatively, Plaintiffs and Class Members were the intended beneficiaries of data protection agreements entered into between Defendants and healthcare providers, including pharmacies, pharmaceutical companies, and patient support programs.

193.    In delivering, directly or indirectly, their Private Information to Defendants and paying for healthcare services, Plaintiffs and Class Members intended and understood that Defendants would adequately safeguard the data as part of that service.

194.    The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under HIPAA or other state of federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

195.    The implied promises include but are not limited to: (1) taking steps to ensure that any agents who are granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the information that is placed in the control of their agents is restricted and limited to achieve an authorized medical purpose; (3) restricting access to qualified and trained agents; (4) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (5) applying or requiring proper encryption; (6)

multifactor authentication for access; and (7) other steps to protect against foreseeable data breaches.

196.    Plaintiffs and Class Members (or their healthcare providers) would not have entrusted their Private Information to Defendants in the absence of such an implied contract.

197.    Had Defendants disclosed to Plaintiffs and Class Members (or their doctors and healthcare providers) that they did not have adequate computer systems and security practices to secure sensitive data, Plaintiffs and Class Members (or their doctors and healthcare providers) would not have provided their Private Information to Defendants.

198.    Defendants recognized that Plaintiffs' and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiffs and Class Members (or their doctors and healthcare providers).

199.    Plaintiffs and Class Members (or their doctors and healthcare providers) fully performed their obligations under the implied contracts with Defendants.

200.    Defendants breached the implied contracts with Plaintiffs and Class Members (or their doctors and healthcare providers) by failing to take reasonable and adequate measures to safeguard their Private Information as described herein.

201.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

<u>**COUNT III**</u>
**Breach of Contractual Duties Owed to Third-Party Beneficiaries**
*(On Behalf of Plaintiffs and the Class against Defendants Cencora and Lash Group)*

202.    Plaintiffs incorporate and reallege all factual allegations above as if fully set forth herein.

203.    Defendants Cencora and Lash Group (and for the purposes of this count

"Defendants") entered into a contract to provide services to Plaintiffs' pharmacies, pharmaceutical companies, healthcare providers, or patient support programs. Upon information and belief, this contract is virtually identical to the contracts entered into between Defendants and their other medical or pharmacy provider customers around the country whose patients were also affected by the Data Breach.

204.    These contracts were made expressly for the benefit of Plaintiffs and the Class, as it was their confidential medical information that Defendants agreed to collect and protect through its services. Thus, the benefit of collection and protection of the Private Information belonging to Plaintiffs and the Class was the direct and primary objective of the contracting parties.

205.    Defendants knew that if they were to breach these contracts with their customers, the customers' patients, including Plaintiffs and the Class, would be harmed by, among other harms, fraudulent transactions.

206.    Defendants breached their contracts with Plaintiffs and Class Members pharmacies, pharmaceutical companies, healthcare providers, or patient support programs affected by this Data Breach when they failed to use reasonable data security measures that could have prevented the Data Breach.

207.    As foreseen, Plaintiffs and the Class were harmed by Defendants' failure to use reasonable security measures to store patient information, including but not limited to the risk of harm through the loss of their Private Information, increased out-of-pocket medical expenses, and loss of access to medications and/or healthcare treatment and other services.

208.    Accordingly, Plaintiffs and the Class are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

## COUNT IV
### Unjust Enrichment
### *(On Behalf of Plaintiffs and the Class)*

209.    Plaintiffs re-allege and incorporate by reference all factual allegations above as if fully set forth herein.

210.    This count is pleaded in the alternative to the breach of contract claims (Counts II and III).

211.    Upon information and belief, Defendants fund any data security measures they implement entirely from their general revenue, including from money they make based upon representations of protecting Plaintiffs' and Class Members' Private Information.

212.    There is a direct nexus between money paid to Defendants and the requirement that Defendants keep Plaintiffs' and Class Members' Private Information confidential and protected.

213.    Plaintiffs and Class Members paid Defendants and/or healthcare providers a certain sum of money, which was used to fund any data security measures implemented by Defendants via contracts with Defendants.

214.    As such, a portion of the payments made by or on behalf of Plaintiffs and Class Members is to be used to provide a reasonable and adequate level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

215.    Protecting the Private Information of Plaintiffs and Class Members is integral to Defendants' businesses. Without their data, Defendants would be unable to provide the healthcare-related services to pharmacies, pharmaceutical companies, healthcare providers, or patient support programs comprising Defendants' core business.

216.    Plaintiffs' and Class Members' data and Private Information has monetary value.

217.    Plaintiffs and Class Members directly and indirectly conferred a monetary benefit on Defendants. They indirectly conferred a monetary benefit on Defendants by purchasing goods and/or services from entities that contracted with Defendants, and from which Defendants received compensation to protect certain data. Plaintiffs and Class Members directly conferred a monetary benefit on Defendants by supplying Private Information, which has value, from which value Defendants derive their business value, and which should have been protected with adequate data security.

218.    Defendants knew that Plaintiffs and Class Members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

219.    Defendants enriched themselves by saving the costs they reasonably should have expended on adequate data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable and adequate level of security that would have prevented the Data Breach, Defendants instead chose to shirk their data security obligations to increase profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective data security measures. Plaintiffs and Class Members suffered as a direct and proximate result of Defendants' calculated failures to provide the requisite reasonable and adequate data security.

220.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendants failed to implement reasonable and adequate data management and security measures that are mandated by federal law and industry standards.

221.    Defendants acquired the monetary benefit and Private Information through inequitable means in that they failed to disclose the inadequate security practices previously

alleged.

222.    If Plaintiffs and Class Members knew that Defendants had not secured their Private Information, they would not have agreed to provide their Private Information to Defendants (or to their physician to provide to Defendants).

223.    Plaintiffs and Class Members have no adequate remedy at law.

224.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; (vii) loss or privacy from the authorized access and exfiltration of their Private Information; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

225.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

226.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendants' services.

## COUNT V
### Bailment
### (*On Behalf of Plaintiffs and the Class*)

227.    Plaintiffs  re-allege and incorporate by reference all factual allegations above as if fully set forth herein.

228.    Plaintiffs and Class Members provided Private Information to Defendants—either directly or through healthcare providers and their business associates—which Defendants were under a duty to keep private and confidential.

229.    Plaintiffs' and Class Members' Private Information is personal property, and was conveyed to Defendants for the certain purpose of keeping the information private and confidential.

230.    Plaintiffs' and Class Members' Private Information has value and is highly prized by hackers and criminals. Defendants were aware of the risks they took when accepting the Private Information for safeguarding and assumed the risk voluntarily.

231.    Once Defendants accepted Plaintiffs' and Class Members' Private Information, they were in the exclusive possession of that information, and neither Plaintiffs nor Class Members could control that information once it was within the possession, custody, and control of Defendants.

232.    Defendants did not safeguard Plaintiffs' or Class Members' Private Information when they failed to adopt and implement reasonable and adequate data security safeguards to

prevent the known risk of a cyberattack.

233.    Defendants' failure to safeguard Plaintiffs' and Class Members' Private Information resulted in that information being accessed or obtained by third-party cybercriminals.

234.    As a result of Defendants' failure to keep Plaintiffs' and Class Members' Private Information secure, Plaintiffs and Class Members suffered injury, for which compensation—including nominal damages and compensatory damages—are appropriate.

## COUNT VI
### Breach of Fiduciary Duty
### *(On Behalf of Plaintiffs and the Class)*

235.    Plaintiffs re-allege and incorporate by reference all factual allegations above as if fully set forth herein.

236.    In light of the special relationship between Defendants and Plaintiffs and Class Members, Defendants became fiduciaries by undertaking a guardianship of the Private Information to act primarily for Plaintiffs and Class Members: (1) for the safeguarding of Plaintiffs' and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants do store.

237.    Defendants had a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of their relationship with patients (or the patients of their healthcare clients), in particular, to keep secure their Private Information.

238.    Defendants breached their fiduciary duty to Plaintiffs and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiffs' and Class Members' Private Information.

239.    Defendants breached their fiduciary duty to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

240.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (vii) the diminished value of Defendants' services they received.

241.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**COUNT VII**
**Utah Consumer Sales Practices Act**
*Utah Code §§ 13–11–1, et seq.*
***(On Behalf of Plaintiff Lovato and the Utah Subclass)***

242.    Plaintiff Lovato identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Utah Subclass re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

243.    Defendants are each a person as defined by Utah Code § 13-11-1(5).

244.    Defendants are each a "supplier," as defined by Utah Code § 13-11-1(6), because they regularly solicit, engage in, or enforce "consumer transactions," as defined by Utah Code § 13-11-1(2).

245.    Defendants engaged in deceptive and unconscionable acts and practices in connection with consumer transactions, in violation of Utah Code § 13-11-4 and Utah Code § 13-11-5, including:

  a.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff and Utah Subclass members' Private Information, which was a direct and proximate cause of the Data Breach;

  b.  Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

  c.  c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Utah Subclass members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, and the Utah Protection of Personal Information Act, Utah Code § 13-44-201, which was a direct and proximate cause of the Data Breach;

  d.  Misrepresenting that it would protect the privacy and confidentiality of Plaintiff and Utah Subclass members' Personal Information, including by implementing and maintaining reasonable security measures;

e.  Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Utah Subclass members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, and the Utah Protection of Personal Information Act, Utah Code § 13-44-201;

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff and Utah Subclass members' Private Information; and

g.  Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Subclass members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, and the Utah Protection of Personal Information Act, Utah Code § 13- 44-201.

246.    Defendants intended to mislead Plaintiff and Utah Subclass members and induce them to rely on its misrepresentations and omissions.

247.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Private Information.

248.    Had Defendants disclosed to Plaintiff and Utah Subclass members that their data systems were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, Defendants received, maintained, and compiled Plaintiff's and Utah Subclass members' Private Information as part of the services Defendants provided and for which

Plaintiff and Utah Subclass members paid without advising Plaintiff and Utah Subclass members that Defendants' data security practices were insufficient to maintain the safety and confidentiality of Plaintiff's and Utah Subclass members' Private Information. Accordingly, Plaintiff and the Utah Subclass members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

249.    Defendants had a duty to disclose the above facts due to the circumstances of this case and the sensitivity and extensivity of the Private Information in its possession. This duty arose because Plaintiff and the Utah Subclass members reposed a trust and confidence in Defendants when they provided their Private Information to Defendants in exchange for Defendants' services. In addition, such a duty is implied by law due to the nature of the relationship between consumers, including Plaintiff and the Utah Subclass, and Defendants because consumers are unable to fully protect their interests with regard to their data, and placed trust and confidence in Defendants. Defendants' duty to disclose also arose from its:

      a.  Possession of exclusive knowledge regarding the security of the data in their systems

      b.  Active concealment of the state of their security; and/or

      c.  Incomplete representations about the security and integrity of its computer and data systems, and its prior data breaches, while purposefully withholding material facts from Plaintiff and the Utah Subclass that contradicted these representations.

250.    Defendants intentionally or knowingly engaged in deceptive acts or practices, violating Utah Code § 13-11-4(2) by:

      a.  indicating that the subject of a consumer transaction has sponsorship,

approval, performance characteristics, accessories, uses, or benefits, if it has not;

b.  indicating that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not;

c.  indicating that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not;

d.  indicating that the subject of a consumer transaction will be supplied in greater quantity (e.g. more data security) than the supplier intends.

251.    Defendants engaged in unconscionable acts and practices that were oppressive and led to unfair surprise, as shown in the setting, purpose, and effect of those acts and practices. Defendants' acts and practices unjustly imposed hardship on Plaintiff and the Utah Subclass by imposing on them, through no fault of their own, an increased and imminent risk of fraud and identity theft; substantial cost in time and expenses related to monitoring their financial accounts for fraudulent activity and cancelling and replacing passports; and lost value of their Private Information. The deficiencies in Defendants' data security, and the material misrepresentations and omissions concerning those deficiencies, led to unfair surprise to Plaintiff and the Utah Subclass when the data breach occurred.

252.    In addition, there was an overall imbalance in the obligations and rights imposed by the consumer transactions in question, based on the mores and industry standards of the time and place where they occurred. Societal standards required Defendants, as carriers of the most sensitive and confidential health information of millions of vulnerable patients across the country, to adequately secure Private Information in their possession. There is a substantial imbalance between the obligations and rights of consumers, such as Plaintiff and the Utah Subclass, and

Defendants, which has complete control over the Private Information in their possession.

253.    Defendants' acts and practices were also procedurally unconscionable because consumers, including Plaintiff and the Utah Subclass, had no practicable option but to have their Private Information stored in Defendants' systems if they wanted to utilize Defendants' services. Defendants exploited this imbalance in power, and the asymmetry of information about its data security, to profit by inadequately securing the Private Information in its systems.

254.    As a direct and proximate result of Defendants' unconscionable and deceptive acts or practices, Plaintiffs and Utah Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Defendants' as they would not have paid Defendants' for goods and services or would have paid less for such goods and services but for Defendants' violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; time and money spent cancelling and replacing passports; loss of value of their Private Information; and an increased, imminent risk of fraud and identity theft.

255.    Defendants' violations present a continuing risk to Plaintiffs and Utah Subclass members as well as to the general public.

256.    Plaintiff and Utah Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages of $2,000 per violation, amounts necessary to avoid unjust enrichment, under Utah Code §§ 13-11-19, et seq.; injunctive relief; and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

a)      For an Order certifying this action as a Class Action and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

b)      For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

c)      For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d)      For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

e)      Ordering Defendants to pay for not less than five years of credit monitoring services for Plaintiffs and the Class;

f)      For an award of actual damages, compensatory damages, statutory damages, nominal damages, and/or statutory penalties, in an amount to be determined, as allowable by law;

g)      For an award of punitive damages, as allowable by law;

h)      Pre- and post-judgment interest on any amounts awarded; and,

i)      Such other and further relief as this court may deem just and proper.

## **JURY TRIAL DEMANDED**

Under Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

Dated: June 14, 2024

Respectfully submitted,

*/s/ Jeannine M. Kenney*
Jeannine M. Kenney (PA Bar Id. 307635)
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
T: (215) 985-3270
F: (215) 985-3271
jkenney@hausfeld.com

*/s/ Mindee J. Reuben*
Mindee J. Reuben (PA Bar Id. 75308)
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
1515 Market Street, Suite 1200
Philadelphia, PA 19102
Tel: 215-854-4060
Fax: 973-623-0858
mreuben@litedepalma.com

Joseph J. DePalma*
Catherine B. Derenze*
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
570 Broad Street, Suite 1201
Newark, NJ 07102
Tel: 973-623-3000
Fax: 973-623-0858
jdepalma@litedepalma.com
cderenze@litedepalma.com

James J. Pizzirusso*
Mandy Boltax*
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, D.C. 20006
(202) 540-7200
jpizzirusso@hausfeld.com
mboltax@hausfeld.com

Steven M. Nathan*
Ashley Crooks*
**HAUSFELD LLP**
33 Whitehall Street, Fourteenth Floor
New York, NY 10004
(646) 357-1100
snathan@hausfeld.com
acrooks@hausfeld.com

***Counsel for Plaintiffs***

***\*Pro Hac Vice Forthcoming***